UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                 )
DEFENDERS OF WILDLIFE, et al.,   )
                                 )
        Plaintiffs,              )
                                 )
        v.                       )    Civil Action No. 10-1915 (RWR)
                                 )
LISA JACKSON,                    )
                                 )
        Defendant.               )
_____)
```

<u>MEMORANDUM OPINION</u>

Plaintiffs Defenders of Wildlife and the Sierra Club filed a complaint against the Administrator of the Environmental Protection Agency ("EPA") under the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(2), to compel the EPA to revise certain regulations governing wastewater discharges from power plants, and they simultaneously filed a proposed consent decree resolving the complaint.  The Utility Water Act Group ("UWAG"), a trade organization whose members include hundreds of electric power companies, seeks to intervene as a defendant under Federal Rule of Civil Procedure 24, challenging as truncated the rulemaking schedule proposed in the parties' consent decree.  The existing parties oppose intervention, arguing that UWAG has no legally protectable interest in the rulemaking schedule and will suffer no cognizable injury if it is adopted.  Because UWAG has not demonstrated that it has standing or that entering the consent decree will impair its legally protectable interests, and because

intervention will unduly delay this litigation, the motion to intervene will be denied.

BACKGROUND

Enacted in 1972, the CWA "regulates the discharge of pollutants into navigable waters[.]"[1] Natural Res. Def. Council, Inc. v. Cnty. of L.A., No. 10-56017, 2011 WL 2712963, at *9 (9th Cir. July 13, 2011) (internal quotation marks and citation omitted).  It seeks to "restore and maintain the . . . integrity of the Nation's waters by replacing water quality standards with point source[2] effluent limitations."  Nw. Envtl. Def. Ctr. v. Brown, 640 F.3d 1063, 1070 (9th Cir. 2011) (internal quotation marks and citation omitted).  An "effluent limitation [i]s 'any restriction established by . . . the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters[.]'"  Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 390 n.1 (4th Cir. 2011) (quoting 33 U.S.C. § 1362(11)).  In turn, an effluent

---

[1] Congress enacted the Federal Water Pollution Control Act in 1972; it was renamed the CWA in 1977.  Nw. Envtl. Def. Ctr. v. Brown, 640 F.3d 1063, 1069-70 (9th Cir. 2011).

[2] "A point source is 'any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, [or] well . . . from which pollutants are or may be discharged."  Natural Res. Def. Council, Inc., 2011 WL 2712963, at *3.

limitation guideline ("ELG") is determined in light of "the best practicable control technology currently available." 33 U.S.C. § 1314(b)(1)(A).

The CWA requires the EPA to review effluent limitations, and to revise them as appropriate, "at least every five years." 33 U.S.C. § 1311(d). The EPA also must annually "revise, if appropriate," the regulations setting forth ELGs. Id. § 1314(b). While the agency has combined these processes over the last three decades by simultaneously promulgating guidelines that include effluent limitations (Pls.' Opp'n to UWAG's Mot. to Interv. ("Pls.' Opp'n") at 4), it last revised the ELGs applicable to the steam electric point source category in 1982. (Id.; UWAG's Stmt. of P. and A. in Supp. of Mot. to Intervene ("UWAG's Stmt.") at 3.) In 2009, the EPA announced its intention to revise the steam electric ELGs again. (UWAG's Stmt. at 3-4.) The agency published a plan to that effect and, as of June 2010, had collected effluent-relevant data from UWAG members and other electric power plants. (Id. at 4.)

The plaintiffs sued the EPA on November 8, 2010, challenging its "fail[ure] to comply with its mandatory duty to . . . review . . . the ELGs for the Steam Electric Power Generating category and to revise the regulations accordingly[.]" (Pls.' Opp'n at 6; see also Compl. ¶¶ 3, 19.) The parties jointly moved for entry of a consent decree the same day. (See generally Joint Mot. to Enter Consent Decree.) The decree requires the EPA to sign 1) a

notice of proposed rulemaking as to steam electric ELGs no later than July 23, 2012, and 2) a decision taking final action following notice and comment rulemaking no later than January 31, 2014. (Consent Decree ¶¶ 3-4.) However, the schedule "may be extended by written agreement of the parties and notice to the Court." (Id. ¶ 5.) The decree makes no "admission [of a violation of any law, rule, regulation or policy] or determination of any issue of fact or law[.]" (Consent Decree at 2; id. ¶¶ 12, 18). Further, it "shall [not] be construed to limit or modify the discretion accorded EPA by the [CWA] or by general principles of administrative law" in the course of rulemaking. (Id. ¶ 15.)

On November 16, 2010, UWAG moved to intervene as a defendant "in order to express its views on the rulemaking schedule" the parties proposed and to challenge the court's subject matter jurisdiction over the complaint. (UWAG's Mot. at 2.) UWAG, whose members are subject to EPA regulation, argues that the schedule "will impede EPA's ability to provide an adequate comment period" (UWAG's Stmt. at 14), and prevent any evaluation of the court's jurisdiction. (Id. at 8.) UWAG also surmises that any revisions "will significantly impact the permitting and operation of facilities owned by UWAG members and could" substantially burden UWAG members' economic interests. (Id. at 5.) Both parties have opposed intervention because UWAG's concerns "are not only speculative but also premature." (Pls.'

Opp'n at 8.) They argue that the rulemaking schedule does not "dictat[e] the substance of the agency's future actions[,]" that UWAG "will have every opportunity to participate in the lengthy rulemaking process[,]" and that the complaint's allegations that the EPA has violated a non-discretionary duty are sufficient to confer jurisdiction. (Pls.' Opp'n at 1, 16; Def.'s Opp'n at 1-2.) The parties also challenge UWAG's standing to intervene.

DISCUSSION

I. JURISDICTION

The CWA's citizen-suit provision waives "sovereign immunity for claims [involving the Administrator's] failure . . . to perform any [non-discretionary] act or duty[.]" Sierra Club v. EPA, 475 F. Supp. 2d 29, 31-32 (D.D.C. 2007) (quoting 33 U.S.C. § 1365(a)(2)) (emphasis removed). The Act imposes "a nondiscretionary duty . . . only when [its] provision[s] set[] bright-line, date-specific deadlines for specified action." Raymond Proffitt Found. v. EPA, 930 F. Supp. 1088, 1098 (E.D. Pa. 1996); see also Envtl. Def. v. Leavitt, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) (stating that "[e]xpress deadlines in the [Clean Air Act] typically create nondiscretionary duties to act"). To compel such action, the "citizen suit must [identify] a nondiscretionary duty that is 'readily-ascertainable' and not 'only [ ] the product of a set of inferences based on the overall statutory scheme.'" Our Children's Earth Found. ("OCEF") v. EPA, 527 F.3d 842, 851 (9th Cir. 2008) (quoting Sierra Club v. Thomas,

828 F.2d 783, 791 (D.C. Cir. 1987)) (alteration in original). The court has jurisdiction only if the EPA has failed to fulfill a nondiscretionary duty. Sierra Club v. EPA, 475 F. Supp. 2d at 31.

UWAG argues that the CWA imposes no nondiscretionary duty upon the EPA to complete its review of steam electric ELGs and determine whether to revise them. (UWAG's Reply at 5-6.) However, as UWAG concedes, a "'non-discretionary duty' imposed by [the CWA] is the duty to undertake the required review on the schedule specified[.]" (UWAG's Reply at 3.) The "EPA has an obligation to review effluent guidelines [annually] and limitations [every five years] for possible revision[.]" OCEF v. EPA, 527 F.3d at 849 (emphasis added); see also 33 U.S.C. §§ 1311(d), 1314(b). "[S]uch . . . review is mandatory." OCEF v. EPA, 527 F.3d at 849. (See also Pls.' Opp'n at 6; Compl. ¶ 43.)

While "[t]he court does not know exactly what Congress meant" in directing the EPA to revise ELGs "if appropriate," even the EPA concedes that 28 years "is clearly too long when matched with [the CWA's] stated deadlines and . . . provisions for review[.]" Raymond Proffitt Found., 930 F. Supp. at 1099-100; see also 33 U.S.C. §§ 1311(d), 1314(b) (specifying annual and quinquennial deadlines for reviewing ELGs and effluent limitations.) (See also Pls.' Opp'n at 6 (quoting the EPA's October 29, 2009 notice stating that "[t]he current [ELGs], which

were last updated in 1982, do not adequately address the pollutants being discharged and have not kept pace with changes that have occurred in the electric power industry over the last three decades.").)  The "ultimate decision whether to revise the guidelines and limitations is discretionary[.]"  OCEF v. EPA, 527 F.3d at 849 (emphasis removed).  However, "[i]t is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking."  Bennett v. Spear, 520 U.S. 154, 172 (1997).  The plaintiffs complained that despite its duty to do so, the EPA has not completed the requisite review of effluent limitations and ELGs for over a quarter-century. (Compl. ¶ 43.)  "Nothing more is needed to invoke this Court's jurisdiction."  (Pls.' Opp'n at 15.)  See also El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 850 (D.C. Cir. 2010) (characterizing dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction as generally "reserved for complaints resting on truly fanciful *factual* allegations[]") (emphasis in original) (internal citation omitted).  Thus, the court has subject-matter jurisdiction over this case; the proposed rulemaking schedule has no impact on that assessment.  See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 587 (1999) ("in most instances subject-matter jurisdiction will involve no arduous inquiry"); see also Curran v. Holder, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) ("the Court is obligated to

determine whether it has subject-matter jurisdiction in the first instance.") (internal quotation marks and citation omitted).

The central open question is whether UWAG may intervene as of right or permissively, or not intervene at all.  See Fed. R. Civ. P. 24(a)(2), (b)(1)(B), (b)(3).

## II.  INTERVENTION AS OF RIGHT

A prospective intervenor as of right must fulfill all four prerequisites enumerated in Federal Rule of Civil Procedure 24(a).  United States v. Philip Morris USA Inc., 566 F.3d 1095, 1146 (D.C. Cir. 2009).  These include (1) timely moving to intervene, (2) having an interest relating to the subject of the action (3) which would be impaired or impeded by the disposition of the action and (4) which no party adequately represents.  Id. The parties contend that such an intervenor must also meet Article III standing requirements[4] (Pls.' Opp'n at 8, 10; Def.'s Opp'n at 5), while UWAG argues that "the Article III standing and

---

[4]  See, e.g., Fund for Animals, Inc. v. Norton, 322 F.3d 728, 731-32 (D.C. Cir. 2003) ("[I]n addition to establishing its qualification for intervention under Rule 24(a)(2), a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution."); Philip Morris, 566 F.3d at 1146; Ctr. For Biological Diversity v. EPA, 274 F.R.D. 305, 308 (D.D.C. 2011); Akiachak Native Cmty. v. U.S. Dep't of Interior, 584 F. Supp. 2d 1, 5 (D.D.C. 2008).

Rule 24(a)(2) interest requirements are [not] additive"[5] (UWAG's Reply at 8).  The outcome here is the same under either view.

A.   Standing

An association has standing to sue on behalf of its members "only if (1) at least one of its members would have standing to sue in [it]s own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit."[6]  Cnty. of San Miguel, Colo. v. MacDonald, 244 F.R.D. 36, 43 (D.D.C. 2007).  UWAG's interest in this litigation appears to be "germane to its purpose."  Id.  (See also UWAG's Stmt. at 6 ("UWAG's purpose is to participate on behalf of its members collectively in EPA's rulemakings under the CWA and in litigation arising from those rulemakings.").)  Further, "neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit."  Cnty. of San Miguel, 244 F.R.D. at 43.

---

[5] See, e.g., Roeder v. Islamic Republic of Iran, 333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement."); Akiachak Native Cmty., 584 F. Supp. 2d at 7.

[6] Neither the parties nor UWAG has briefed whether the organization has standing as an association to sue on behalf of its members.  (See UWAG's Stmt. at 5 ("UWAG seeks . . . to protect its members' interest in EPA's rulemaking[]").)

To establish constitutional standing, a UWAG member must demonstrate "(1) an injury-in-fact that is (a) concrete and particularized and (b) actual and imminent, (2) causation, and (3) redressability." In re Endangered Species Act ("ESA") Section 4 Deadline Litig., 270 F.R.D. 1, 5 (D.D.C. 2010) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). UWAG argues that upon entry of the consent decree, "industry's views on the consequences of the schedule now and as the schedule may be adjusted in the future would not be heard," and that "industry may spend . . . billions of dollars" "[i]f the result[ing rule] is more stringent than the evidence justifies[.]" (UWAG's Stmt. at 16.) However, UWAG states that "EPA and UWAG have been engaged for months in collecting data on wastewater from power plants." (Id. at 13.) The decree would preclude UWAG neither from continuing to "participat[e] in the rulemaking [n]or from challenging the final rule that emerges." Envtl. Def., 329 F. Supp. 2d at 68. Further,

> where, as here, [UWAG] . . . can offer no
> evidence that (1) [its] views will not be
> taken into account in the administrative
> process . . . ; (2) [its] interests will be
> prejudiced as a result of the timetable . . .
> contained in the Consent Decree; or (3) EPA
> is under any obligation imposed by the
> proposed Consent Decree to issue certain
> substantive regulations, or any regulations
> at all, there is simply no basis for
> concluding that intervention is warranted.

Cronin v. Browner, 898 F. Supp. 1052, 1063 (S.D.N.Y. 1995).

Because UWAG has not articulated any concrete, particularized, actual, and imminent injury it or its members will suffer upon entry of the consent decree, it has not demonstrated an "impairment sufficient to satisfy . . . constitutional standing[.]"  Envtl. Def., 329 F. Supp. 2d at 68.[7] Thus, none of UWAG's members would have standing to sue in its own right, and UWAG lacks standing to intervene on its members' behalf.  Even if UWAG were able to satisfy the standing requirements, it has not met all of the Rule 24 prerequisites for intervention as of right.[8]

B.    Legally protectable interest

Prospective intervenors must demonstrate an interest relating to the subject of the action.  Philip Morris, 566 F.3d at 1146.  This prerequisite is satisfied "not [by] any interest the applicant can put forward, but only [by] a legally protectable one."  Roane v. Gonzales, 269 F.R.D. 1, 3 (D.D.C. 2010) (internal quotation marks and citation omitted) (emphasis

_____

[7] "[P]otential intervenors must demonstrate 'prudential' as well as constitutional standing."  In re Vitamins Antitrust Class Actions, 215 F.3d 26, 29 (D.C. Cir. 2000).  "Prudential standing requires that the [movant's] complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  Pai v. U.S. Citizenship and Immigration Services, 810 F. Supp. 2d 102, 108 (D.D.C. 2011). Because UWAG has not satisfied the requirements of constitutional standing, the issue of prudential standing need not be reached.

[8] The parties do not dispute that UWAG's motion was filed timely.  Nor do they appear to dispute that they do not adequately represent UWAG's interests.

in original).  A legally protectable interest is "'of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment.'"[9]  In re ESA, 270 F.R.D. at 5 (quoting United States v. Am. Tel. and Tel. Co., 642 F.2d 1285, 1291-92 (D.C. Cir. 1980)).

UWAG has not articulated a legally protectable interest in the proposed rulemaking schedule.  UWAG asserts its interest in allowing enough time for the EPA to complete the tasks attendant to rulemaking.  (UWAG's Stmt. at 15.)  It argues that the schedule will determine "how much the rule will cost, what the effects will be on electric power supply and reliability, and whether the electric utility industry can [timely] comply[.]"  (Id. at 12.)  "[S]having more time" will rush the EPA through the rulemaking process,[10] the argument continues, stripping UWAG of

---

[9] No judgment on the merits is at issue here.  Am. Nurses Ass'n v. Jackson, Civil Action No. 08-2198 (RMC), 2010 WL 1506913, at *1 (D.D.C. Apr. 15, 2010) (quoting Local Number 93, Int'l Ass'n of Firefighters, AFL-CIO, C.L.C. v. City of Cleveland, 478 U.S. 501, 519 (1986)).  "[B]y entering this consent decree the Court is only accepting the parties' agreement to settle, not adjudicating" the merits of the plaintiffs' position.  Id.  Even if the consent decree were construed to have adjudicated the plaintiffs' claim, the decree would not impair or impede UWAG's interests, as is explained below.

[10] As an example of "how badly an agency can do when it lacks time," UWAG cites the regulations the EPA completed for stormwater discharges from construction and development.  (UWAG's Stmt. at 14.)  There, according to UWAG, the EPA "asked a district court for four years to promulgate the rules" and was granted only three.  Here, the consent decree accords EPA all the time it has requested and provides a schedule subject to

its right to comment and the EPA of time needed to "do justice" to comments made.[11] (Id. at 14.) Though these concerns are

> not insubstantial . . . the Court cannot now gauge the adequacy, or lack thereof, of the schedule. Should haste make waste, the resulting regulations will be subject to successful challenge.[12] If EPA has correctly

> estimated the speed with which it can do the necessary data gathering and analyses, harmful emissions will be sooner reduced. If EPA needs more time to get it right, it can seek more time.

---

modification. (Consent Decree ¶ 5.) Such flexibility undermines UWAG's argument that the "EPA cannot foresee how much time will be required," as the agency need not make any projection now. (UWAG's Reply at 19.)

[11] UWAG argues that the EPA "has failed to allot sufficient time and resources to address UWAG's concerns [as to] data and system variability." (UWAG's Reply at 11.) To support the argument, UWAG asserts that "EPA's decision not to broaden its sampling was at least partially driven by scheduling concerns." (Id.) Such speculation offers no evidence of the claim that "UWAG's experience in this very rulemaking demonstrates that EPA's rush to complete the rulemaking has curtailed the industry's procedural rights and increased its costs[.]" (Id. at 10.)

[12] UWAG cites Natural Res. Def. Council v. Costle, 561 F.2d 904, 909 (D.C. Cir. 1977) for the proposition that intervention may not be denied under Rule 24(a)(2) simply because "applicants may vindicate their interests in some later, albeit more burdensome, litigation." (See UWAG's Reply at 9.) However, Costle is inapposite. "Here, the Court's rationale for denying intervention is not based on the premise that the Movant has a legally protected interest, but can protect those interests at a later time. Rather, . . . the Movant [has not articulated] a legally protected interest [at all] . . . and [its] . . . rights are not impaired in this case." Maverick Entertainment Group, Inc. v. Does 1-2,115, Civil Action No. 10-569 (BAH), 2011 WL 4351354, at *5 (D.D.C. Sept. 19, 2011).

Am. Nurses Ass'n v. Jackson, Civil Action No. 08-2198 (RMC), 2010 WL 1506913, at *2 (D.D.C. Apr. 15, 2010). Because UWAG has not demonstrated that "the suggested timetable is inadequate or that modifications to the timetable are likely to be necessary, and that any such inadequacies or modifications would" injure or impair UWAG's interests, Envtl. Def., 329 F. Supp. 2d at 68, UWAG has made no showing that it "will . . . lose" if the decree is entered. In re ESA, 270 F.R.D. at 5.

"If the review's speed causes substantive deficiencies in any final rules, applicants then might have a protected interest. But mere speculation[] . . . is not enough." OCEF v. EPA, No. C 05-05184, 2006 WL 1305223, at *3 (N.D. Cal. May 11, 2006). Here, UWAG's scheduling concerns appear to be both unsupported and premature. The risk of rushing seems diminished since the data gathering has already begun, and the proposed schedule is subject to easy modification[13] and is only two months shorter than a

---

[13] UWAG asserts that "it will be hard to change the schedule," that "Court proceedings over scheduling will then use up more of EPA's time," and that "30 months is unlikely to be enough time for EPA to collect and analyze the data it needs." (UWAG's Stmt. at 14, 16; UWAG's Reply at 12.) Actually, it is possible that UWAG's intervention efforts are using up more of EPA's time that it could be spending addressing UWAG's comments and the "EPA's broad policy goals of protecting human health and the environment[.]" Riverkeeper, Inc. v. Whitman, No. 93 Civ. 0314, 2001 WL 1505497, at *5 (S.D.N.Y. Nov. 27, 2001). But, if more time is needed for the parties to assess or address UWAG's data, the schedule may be modified simply "by written agreement of the parties and notice to the Court." (Consent Decree ¶ 5.) See also OCEF v. EPA, No. C 05-05184, 2006 WL 1305223, at *3 n.3 (N.D. Cal. May 11, 2006) ("Applicants . . . fail to acknowledge that the decree's schedule is not set in stone."). And UWAG

schedule the EPA "previously and voluntarily announced."  (See UWAG's Stmt. at 3-4; Def.'s Opp'n at 2; Pls.' Opp'n at 1, 9 ("the agency has a substantial head start [because it] already has published lengthy reports in 2006, 2008, and 2009 that characterize power plant discharges and the wastewater treatment control technologies that are available to address them").)  Also, UWAG has been, and by most accounts will continue to be, actively engaged in the rulemaking process.  (See, e.g., UWAG's Stmt. at 4 ("[t]o gather more data for the rulemaking, in June 2010 EPA distributed a voluminous, complex, detailed questionnaire to electric power plants, many of which are owned by UWAG members"); id. at 13 ("EPA and UWAG have been engaged for months in collecting data on wastewater from power plants.").)[14]  UWAG has not asserted any legally protectable interest in the parties' proposed rulemaking schedule.

C.  Impairment of interest

UWAG's alleged injury does not meet Rule 24(a)'s impairment-of-interest requirement.  See Envtl. Def., 329 F. Supp. 2d at 68.  "Whether a proposed intervenor is 'so situated that disposing of the action may as a practical matter impair or

makes no showing that as it continues to provide data during the review process, it could not ask the parties upon a showing of good cause to seek a needed schedule modification.

[14] See also Riverkeeper, 2001 WL 1505497, at *4 (describing applicants who "paint[ed] a picture of a protracted exclusion from the rulemaking process" despite having "regular[ly] and substantial[ly] participa[ted]" in it).

impede its ability to protect its interest[]' is determined by 'looking to the practical consequences of denying intervention, even where the possibility of future challenge to the regulation remain[s] available.'" Roane, 269 F.R.D. at 4 (quoting Fed. R. Civ. P. 24(a)(2); Fund for Animals, Inc. v. Norton, 322 F.3d 728, 735 (D.C. Cir. 2003)). UWAG does not dispute that it later may challenge the revised ELGs, if any, and does not explain why the "EPA's rulemaking, which is in full progress [with UWAG's participation] already," will not "continue apace, independent of this litigation." (UWAG's Stmt. at 9.) UWAG therefore has not demonstrated any impairment of interest warranting intervention.[15] UWAG's failure to satisfy the interest and impairment requirements preclude its intervention as of right in this matter.

III. PERMISSIVE INTERVENTION

Alternatively, UWAG seeks to intervene under Rule 24(b).[16] The Rule "provides for permissive intervention on a timely motion, where the applicant 'has a claim or defense that shares

_____

[15] UWAG also argues that it need not "prove specifically how a schedule will impair its rights in the future." (UWAG's Reply at 9.) Here, however, UWAG has not offered any basis for the court to conclude that it may suffer impairment.

[16] "[T]here is substantial confusion as to whether the D.C. Circuit's reading of Rule 24(b) allows for permissive intervention where the would-be intervenor lacks Article III standing." See Ctr. for Biological Diversity, 274 F.R.D. at 313 (collecting cases). For this reason, UWAG's motion for permissive intervention will be evaluated on its merits.

with the main action a common question of law or fact.'" In re ESA, 270 F.R.D. at 5 (quoting Fed. R. Civ. P 24(b)(1)(B)). A court considers "whether the facts necessary to assert [the intervenor's] claim are essential[ly] the same facts as those necessary to establish [an existing party's] claim," Roane, 269 F.R.D. at 5 (internal quotation marks and citation omitted), and whether the intervention will "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Courts in this district have also considered "whether parties seeking intervention will significantly contribute to . . . the just and equitable adjudication of the legal question presented." Ctr. for Biological Diversity, 274 F.R.D. at 313 (internal quotation marks and citation omitted).

UWAG contends that its timely motion addresses "only . . . questions of fact and law raised by EPA's and [the plaintiffs'] court papers." (UWAG's Stmt. at 18.) UWAG's claim certainly presents common questions of law and fact with the main action, because it challenges a rulemaking schedule the parties have proposed under the Clean Water Act. However, as UWAG admits (UWAG's Mot. at 2; UWAG's Stmt. at 18; UWAG's Reply at 5-6), it "seeks to intervene for the very purpose of pressing the argument that the court lacks subject-matter jurisdiction. This circumstance certainly is unusual, but it does not warrant permissive intervention." Envtl. Defense, 329 F. Supp. 2d at 69. Inviting a challenge to the subject matter jurisdiction that this

opinion has already confirmed invites nothing but more delay in bringing closure to an overdue rulemaking process. UWAG's participation would not significantly help to resolve relevant legal issues. Rather, "intervention is likely to unduly delay the adjudication of the original parties' rights[,]" since "the instant motion for intervention and the . . . briefing surrounding it has already delayed . . . consideration of the . . . consent decree." D.C. v. Potomac Elec. Power Co., Civil Action No. 11-00282 (BAH), 2011 WL 6000851, at *6 (D.D.C. Dec. 1, 2011). Thus, the motion for permissive intervention will be denied.

CONCLUSION

UWAG has failed to demonstrate its standing and any impairment of a legally protectable interest in this litigation if the consent decree is entered. UWAG's intervention to challenge an already settled jurisdictional issue would cause unwarranted delays. Thus, UWAG's motion to intervene will be denied. A separate Order accompanies this Memorandum Opinion.

SIGNED this 18th day of March, 2012.

/s/<br>RICHARD W. ROBERTS<br>United States District Judge